UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:22-CV-10710

JORGE MENDOZA;
CARLA GOMES;
CHRISTIAN SILVESTRI;
PATRICK MENDOZA,
        **Plaintiffs,**

**v.**

MICHELLE WU in her official capacity as
Mayor of the City of Boston,
        **Defendant.**

## MEMORANDUM OF LAW IN SUPPORT OF MAYOR MICHELLE WU'S MOTION TO DISMISS

_____

## I.    FACTS

On March 10, 2020, Governor Charles D. Baker issued COVID Order No. 35 which in part

allowed local licensing authorities to approve the extension of a licensed premises to include

outdoor dining without a hearing before the local licensing board or review by the Alcoholic

Beverages Control Commission.[1]  The order further provided that the mayor, select board or chief

executive of a municipality shall establish the process for approving such requests.  The expedited

licensing process established under the order remains in effect until April 1, 2023 pursuant to

_____

[1] This Court may consider the order on a motion to dismiss because it is "integral to or explicitly relied upon in the complaint, though not attached to the complaint." Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000).  Additionally, the Order at issue is a "matter of public record" that is subject to judicial notice under Fed. R. Evid. 201.  See Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013).   Throughout the COVID-19 pandemic, "[c]ourts presiding over similar cases have taken judicial notice of Public Health Orders regarding the coronavirus." Legacy Church, Inc. v. Kunkel, 472 F. Supp. 3d 926, 1066-67 (D.N.M. 2020).

Section 19 of Chapter 20 of the Acts of 2021 as amended by Chapter Section 27 of Chapter 42 of the Acts of 2022.[2]

For the 2022 outdoor dining season, the City is utilizing the expedited licensing process described above to grant temporary extensions of licensed premises outdoors within the public right of way.  See Pl. Compl. ¶¶ 7-8.  For the 2022 outdoor dining season, the City instituted certain requirements specific to restaurants located within the North End neighborhood of Boston, including a fee and the provision of replacement parking, as part of the process for the approval of the extension of a licensed premises to include outdoor dining within the public right of way.  See Pl. Compl. ¶ 7.  Restaurants located in the North End that desired to increase capacity and extend their premises onto the public right of way were required to pay a fee that could amount to a maximum of $7,500 and to replace any resident parking spaces eliminated by a restaurant's outdoor dining space through rental of parking spaces at designated North End garages.  Id.  For 2022, there is no fee or parking spot replacement requirement for restaurants seeking temporary license extensions into the public right of way in other parts of Boston.  Id. at ¶ 8.  In all parts of Boston, participation in the on-street seating program is voluntary.

Each Plaintiff owns a restaurant located in the North End.  Pl. Compl. ¶¶ 9, 11, 14, 16. Each Plaintiff has paid the fee and made arrangements for replacement parking so that their establishments received approval for a premises extension allowing them to increase capacity in

---

[2] The City clarifies that the Governor's Order, as extended by Section 19 of Chapter 20 of the Acts of 2021 as amended by Chapter Section 27 of Chapter 42 of the Acts of 2022, and the City's licensing scheme that is at issue in this case, apply only to the operation of restaurants outside of areas for which they have obtained licenses to operate pursuant to the normal state-created licensing scheme under other, non-temporary provisions of the General Laws. The temporary licensing structure at issue in this case exclusively concerns the opportunity to operate a privately-owned restaurant, including the selling of alcohol, on public streets and sidewalks for which the private business possesses no other license or permit.

their restaurant by extending their licensed premises onto the public right of way.  Pl. Compl. ¶¶ 9-17.

II.   **STANDARD OF REVIEW**

    A.   **Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(1).**

A motion to dismiss for lack of constitutional standing is a challenge to the court's subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).  See Katz v. Pershing, LLC, 672 F.3d 64, 70 (1st Cir. 2012).  The party asserting federal jurisdiction has the burden of demonstrating its existence.  See Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998).  Dismissal is appropriate when the facts alleged in the complaint, taken as true and given all reasonable inferences, do not support a finding of federal subject matter jurisdiction.  See Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009).  A challenge to the court's subject matter jurisdiction should ordinally be addressed before addressing the merits of the case.  See Acosta-Ramírez v. Banco Popular de P. R., 712 F.3d 14, 18 (1st Cir. 2013) (citing Donahue v. City of Boston, 304 F.3d 110, 117 (1st Cir. 2002)).

    B.   **Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6).**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief."  Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).  Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry.  See García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations.  Id.  Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit.  Id.  Second, the Court must "take the complaint's well-pled

(i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." Schatz, 669 F.3d at 55. If they do not, then dismissal is warranted. See Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

III.   **ARGUMENT**

Plaintiffs' Complaint asserts four claims against Mayor Wu in her official capacity as the Mayor of the City of Boston. The claims against Mayor Wu in her official capacity are the equivalent of claims against the City and should be dismissed for the reasons described below. See Kentucky v. Graham, 473 U.S. 159, 165 (1985).

A.   **Counts 1, 2, and 3 Should Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(1) Because Plaintiffs Lack Standing.**

"Article III of the Constitution confines the federal courts to deciding actual cases and controversies." Cotter v. City of Boston, 323 F.3d 160, 166 (1st Cir. 2003). In order to establish Article III standing, a plaintiff must have a "personal stake in the outcome of the controversy." Baker v. Carr, 369 U.S. 186, 204 (1962). "Actions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a stockholder in his own name…even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock." Pignato v. Dein Host, Inc., 835 F.2d 402, 406 (1st Cir. 1987) (quoting Brictson v. Woodrough, 164 F.2d 107, 109 (8th Cir. 1947)). This standing rule applies even where there is only one shareholder in a corporation. See id. The First Circuit has found that this standing requirement applies to actions brought to redress injuries to a corporation under Section 1983. See Diva's Inc. v. City of Bangor, 411 F.3d 30, 42 (1st Cir. 2005) (dismissing plaintiffs' constitutional claims on standing grounds because they did not allege any injury separate from their business' alleged injuries); see also Pagan v. Calederon, 448 F.3d 16, 29-30 (1st Cir. 2006) (underscoring

that individuals do not have Article III standing, even if they allege emotional distress, if those injuries are simply derivative of a corporation's injuries).

Here, Plaintiffs' entire Complaint is premised upon purported injuries to their restaurants because of the fees imposed by the Order.  In fact, because they paid the fees associated with the Order, the only calculable "injury" to the Plaintiffs is the $7,500 fee that each of them paid to utilize the City's property for their outdoor dining.[3]  Plaintiffs do not allege any injuries that are not derivative of these purported "injuries" to their restaurants.  Accordingly, the Plaintiffs do not have Article III standing and Counts 1, 2, and 3 must be dismissed.

      **B.**      **Counts 1, 2, 3 And 4 Must Be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6) Because Plaintiffs Fail To State A Claim Upon Which Relief Can Be Granted.**

            *1.*   *Equal Protection*

The Plaintiffs' Equal Protection claim is presumably based upon the fact that the timing, fees, and parking requirements for on-street licenses in the North End are different than for other neighborhoods of Boston.  But because this distinction is rationally related to the City's interest in being able to manage the quality of life impacts of expanding dining onto the public right of way, the Plaintiff's equal protection claim must be dismissed.

          a)   <u>Plaintiffs Do Not Allege That They Are Being Treated Differently Than Similarly Situated Businesses.</u>

As a preliminary matter, "[w]hen a plaintiff alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the plaintiff must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." <u>Progressive Credit Union v. City of New York</u>, 889 F.3d 40, 49 (2d Cir. 2018).  "To succeed on such a claim, plaintiffs 'must show

---

[3] As well as any monies paid for any City parking spaces that were usurped by their restaurants.

an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'"  Progressive Credit Union, 889 F.3d at 49 (quoting Clubside v. Valentin, 467 F.3d 144, 159 (2d Cir. 2006)).  Plaintiffs have not alleged that they are similarly situated to restaurants in other parts of Boston. The location of a restaurant is relevant to the challenged regulatory distinction in this case.  The distinction the City has drawn is based on location, and the operation of restaurants within the public right of way presents different challenges and impacts based on location.  Because the Plaintiffs have not even alleged that the restaurants in other parts of Boston that are treated differently are "similarly situated," the claim must be dismissed.  See Gianfrancesco v. Town of Wrentham, 712 F.3d 634, 640 (1st Cir. 2013) (dismissing complaint that made no effort to establish how business treated differently from plaintiff was similarly situated).

> b) The Regulation Is Rationally Related To The City's Interest In Managing The Impacts Of On-Street Dining On Quality of Life In Its Neighborhoods.

More fundamentally, the Equal Protection claim must be dismissed because the regulation is rationally related to the City's interest in managing the impacts that the temporary expansion of on-street dining has on quality of life.  "[E]conomic legislation…that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose."  Hodel v. Indiana, 452 U.S. 314, 331 (1981).  A plaintiff "not relying on typically impermissible bases for classification (e.g., race, religion, etc.) must show that it was 'intentionally treated differently from others similarly situated, that no rational basis exist[ed] for that difference in treatment, and the different treatment was based on a malicious or bad faith intent to injure.'"  Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 10 (1st Cir. 2013) (quoting Buchanan v. Maine, 469 F.3d 158, 178

(1st Cir. 2006)).  In cases where a local economic regulation is challenged under the Equal Protection Clause of the U.S. Constitution, courts defer to legislative determinations as to the desirability of a particular regulation.  See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (Local ordinance removing street vendors from the French Quarter, except those that had operated there for more than 8 years, was upheld where the ordinance rationally furthered the legitimate purpose of preserving the appearance and customs that were valued by residents and attractive to tourists).  Correspondingly, local governments have wide latitude to regulate the local economy under their police powers and such rational distinctions may be made when regulating economic activity with less than mathematical certainty.  See City of New Orleans v. Dukes, 427 U.S. at 303, Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 982 (1st Cir. 1989) (noting that government does not violate Equal Protection merely because a classification created by its laws is imperfect).  Furthermore, a local government does not need to achieve a complete elimination of a perceived evil through its regulatory scheme and may implement its programs step-by-step to partially ameliorate such evils.  See City of New Orleans v. Dukes, 427 U.S. at 303; see also Medeiros v. Vincent, 431 F.3d 25, 31-32 (1st Cir. 2005) ("a statute or regulation is not lacking in a rational basis simply because it addresses a broader problem in small or incremental stages").

When applying a rational basis standard to a local economic regulation, the Court must uphold it "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993).  See also Montalvo-Huertas v. Rivera-Cruz, 885 F.2d at 978 ("Under the rational basis test, duly enacted socioeconomic legislation should be upheld so long as *any* set of facts could suffice to establish a rational relationship between the law and the government's legitimate objectives").  The local government's actual reason for adopting a certain economic regulation is "constitutionally

irrelevant" when conducting rational basis review so long as there is some conceivable basis supporting any purported government interest. See Rowe v. Kittery, 320 F.3d 42, 51 & FN 8 (1st Cir. 2003) (quoting U.S. R.R. Retirement Board v. Fritz, 449 U.S. 166, 179 (1980)). Thus, in the instant case, the City may propose any possible basis for its economic regulation at the motion to dismiss stage without the need for further fact-finding so long as such conceived purpose serves any potential government interest.

Here, it is conceivable that the City sought to defray its mitigation costs and to replace lost resident parking caused by restaurants extending their premises into the public right of way in that portion of the City where the extension of premises most greatly impacted quality of life and operation of the streets, and that such a fee and replacement parking requirements would be rationally related to the City's legitimate interests in regulating the public right of way and protecting the public health and safety and quality of life in a unique area of the City with a dense concentration of restaurants. It is conceivable that the extension of licensed premises into the right of public way eliminates resident parking relied on by residents to navigate their daily lives, creates increased trash, traffic, and rodent problems that the community must either tolerate or pay to mitigate, and increase costs to the City such as redoing street markings, increasing licensing enforcement where capacity has increased, cleaning streets and sidewalks, rodent control, and parking enforcement. It is also reasonably conceivable that the North End has significantly more restaurants seeking to operate in the right of way than any other neighborhood, in both in absolute terms as well as in proportion to the population and geographic size of the neighborhoods; that the North End is characterized by narrow sidewalks and high pedestrian volume that makes on-street dining particularly impactful on pedestrians; that the North End has narrow streets that will be significantly impacted by the placement of dining patios in the street; and that on-street dining in

the North End occupies a significantly larger proportion of on-street residential parking spaces than in any other neighborhood.

It is reasonably conceivable that the collective impacts of temporary license expansion in the North End poses a significant quality of life burden in the form of aggregate noise, trash, traffic, difficulty of pedestrians navigating sidewalks, and parking loss that is different in magnitude and kind than experienced in other neighborhoods. In light of such a "reasonably conceivable state of facts," the City could have rationally chosen to regulate restaurants seeking to expand into the public right of way in the North End differently than it regulated restaurants in other areas that did not pose the same collective impacts on quality of life. Making the regulations address the direct residential parking impacts and charging a fee to permit the government to provide additional services to ameliorate the impact that on-street dining in the North End has is rationally related to the City's interest in ensuring that the expansion of private businesses onto the public right of way does not overwhelm the quality of life in any neighborhood. It is no bar to dismissal that the distinction drawn by the regulation might not be "made with mathematical nicety," Dandridge, supra at 485, nor that the City may be taking a piecemeal approach as it assesses the impacts of outdoor dining in the public way and might later choose to tackle quality of life impacts in other neighborhoods as opposed to attempting to address the impacts on every neighborhood all at once, see Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1955); see also Two Guys, 366 U.S. at 591 (holding it was within the power of the legislature to decide to regulate only certain businesses that were particularly disruptive).

Accordingly, as Plaintiffs have failed to state an Equal Protection violation, Count 2 must be dismissed.

2. *Due Process*

The Due Process Clause prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1.  The Due Process Clause has a substantive and procedural component.  See Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006).  The substantive component "functions to protect individuals from particularly offensive actions on the part of government officials even when the government employs facially neutral procedures in carrying out those actions."  Id. at 32.  The procedural component protects against deprivation of protected liberty or property interests without a "constitutionally adequate process."  González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011).  Plaintiffs do not specify whether their due process claim is procedural or substantive in nature.  Regardless, both fail as a matter of law.

To proceed on a procedural due process claim, Plaintiffs must "identify a protected liberty or property interest and allege that the defendants, acting under state law, deprived [them] of that interest without constitutionally adequate process."  Garcia-Gonzalez v. Puig-Morales, 761 F.3d 81, 88 (1st Cir. 2014).  A property interest exists when one has a legitimate claim of entitlement to a right arising from such sources as state statutes, local ordinances, and employment contracts.  See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 576 (1972).  Fatal to any procedural due process claim here is Plaintiffs' failure to identify any protected liberty or property interest.  No local ordinance, state statute, or federal law protects Plaintiffs' interests in extending a private business beyond its existing license to exclusively occupy a portion of the public right of way.  Plaintiffs have alleged no conduct of the City that deprives them of the ability to conduct their business operations in a manner consistent with their existing licenses.

Any procedural due process claim also fails because the City's regulation is a rule of general application that is not subject to the notice and hearing requirements of the Due Process Clause.  The Supreme Court has long drawn a distinction between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases, on the other."  United States v. Fla. E. Coast Ry. Co., 410 U.S. 224, 245 (1973).  Like statutes, local governmental orders, rules, and regulations are typically legislative in nature because they adopt general rules that are not aimed at particular cases or parties.  See e.g. Gallo v. U.S. Dist. Ct. for the Dist. of Arizona, 349 F.3d 1168, 1182-83 (9th Cir. 2003) (court rules that changed attorney licensing requirements are legislative in nature); RR Vill. Ass'n, Inc. v. Denver Sewer Corp., 826 F.2d 1197, 1204-05 (2d Cir. 1987) (citing Minnesota State Board for Community Colleges v. Knight, 465 U.S. 271, 284 (1984), for the proposition that a "policy decision by [an] executive agency would be legislative action").  Referring back to its decision in Bi-Metallic Investment Co. v. State Board of Equalization, the Court has held that "[w]here a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption."  239 U.S. 441, 445 (1915).  In this legislative context, individual due process rights—including notice and a right to be heard—do not attach.  See id. at 445-46.  Here, the City's regulation is legislative in nature because it promulgates a policy that serves the City and applies to multiple businesses based on districts.  Accordingly, the Plaintiffs do not have any individual procedural due process rights.

Plaintiffs likewise fail to state a claim for a violation of substantive due process.  The protections of substantive due process attach only to 1) conduct that "shocks the conscience"; and 2) conduct that violates a fundamental right—a right implicit in the concept of ordered liberty.  See United States v. Salerno, 481 U.S. 739 (1987).  In this case, the Plaintiffs have identified no

infringed upon fundamental right as there exists no fundamental right to operate a restaurant and there is certainly no fundamental right to extend that restaurant onto the public right of way.  See Medeiros v. Vincent, 431 F. 3d 25, 32 (1st. Cir. 2005) ("The 'right to make a living' is not a 'fundamental right' for either equal protection or substantive due process purposes").  The analysis of a substantive due process claim where no fundamental right is implicated is rational basis review.   See Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 976 at n. 7 (1st Cir. 1989).  Furthermore, where the court must apply the same standard of rationality in both equal protection and substantive due process claims, the claims will be analyzed in substantially the same manner. See id.; see also Pearson v. Fair, 935 F.2d 401, 411 n. 18 (1st Cir. 1991) (holding that it was unnecessary to address substantive due process claim at any length where the standard of constitutionality is identical to rationality standard employed in equal protection analysis).  As discussed, the City's economic regulation of North End restaurants operating in the public right of way is rationally related to the City's interests in regulating its right of way, protecting public health and safety, mitigating negative quality of life impacts, and preserving the appearance and character of the North End that are valued by residents and tourists alike.  Where such conceivable rational basis exists along with the high level of deference provided to legislative determinations, the Plaintiffs' substantive due process claim fails as a matter of law.

3.  *Commerce Clause*

A government regulation triggers scrutiny under the Commerce Clause in either of two situations: (1) when the regulation affirmatively discriminates, either on its face or in practical effect, against transactions in interstate commerce; or (2) when the regulation regulates evenhandedly but incidentally burdens interstate transactions.  See Maine v. Taylor, 477 U.S. 131,

138 (1986).  Regulations of the second type are upheld so long as the burdens imposed on interstate trade are not clearly excessive in relation to the putative local benefits.  Id.

Since the City's regulation clearly does not affect interstate commerce on its face, the City surmises that Plaintiffs are suggesting that there is some incidental burden on interstate commerce.  This theory of liability is grasping at straws.  Plaintiffs allege that if they did not pay the outdoor dining fee they would not be able to compete with the restaurants that did.  See Pl. Comp. ¶ 24-25.  While that may be true, the fact that some of their lost patrons may have been tourists from other states does not plausibly state a claim for even an incidental burden on interstate commerce.  There are no allegations that out-of-state diners were treated differently than Massachusetts diners, even incidentally.

However, even assuming arguendo that these allegations could, somehow, allege an incidental burden on interstate commerce, there has been no Commerce Clause violation because any burden was not "clearly excessive" in light of the local benefits.  See Taylor, 477 U.S. at 138. Whether a burden is "clearly excessive" depends on "the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."  Id.  Here, the local benefits of the fee included defraying the costs associated with lost parking, rodent control, licensing enforcement (where licensed premises have increased serving capacity), street cleaning, and parking enforcement.  It is impossible to discern how these benefits could have been promoted by a means with a "lesser impact on interstate activities" when, again, Plaintiffs have not alleged any impact—even incidental—on interstate activities.  In the absence of any allegations as to how the Order affected interstate commerce, the Plaintiffs cannot demonstrate how the Order imposed burdens on interstate commerce that were "clearly excessive".  Accordingly, Plaintiffs' Commerce Clause claim fails as a matter of law.

13

4.      *M.G.L. c. 93A Claim*

In Count 4 of its Complaint, the Plaintiffs seek to avoid application of the regulatory scheme for licensing outdoor dining establishments in the North End by transforming the matter into a G.L. c. 93A claim. The Plaintiffs claim that they are entitled to relief under c. 93A, § 2, because the City's actions "set up 'unfair methods of competition' and/or are 'unfair or deceptive practices' in 'commerce' in violation of M.G.L. c. 93A".  Pl. Compl. ¶ 33.  To succeed on this claim, the Plaintiff will need to prove, among other things, that the City engaged in an "unfair or deceptive act or practice," and that it did so in the conduct of "trade or commerce."  G.L. c. 93A, § 11. Count 4 must be dismissed because the Plaintiff has not sufficiently alleged that the City was engaged in trade or commerce.

The Plaintiffs' c. 93A claim should be dismissed because the Plaintiff has not alleged facts which plausibly allege that the City was engaged in "trade or commerce," which is a requisite for liability under G. L. c. 93A, § 11.  Massachusetts courts have not conclusively determined whether a claim under c. 93A can be brought against a municipality.  See Park Drive Towing, Inc. v. Revere, 442 Mass. 80, 86 (2004); City of Beverly v. Bass River Golf Mgmt., Inc., 92 Mass. App. Ct. 595, 605 (2018); M. O'Connor Contracting, Inc. v. Brockton, 61 Mass. App. Ct. 278, 284 n.8 (2004).  Regardless, a plaintiff claiming that a municipality violated c. 93A must demonstrate that the municipality was "acting in a business context," meaning that it was engaged in "trade or commerce," as a threshold requirement for recovery.  Bass River Golf Mgmt., 92 Mass. App. Ct. at 605 (quoting Park Drive Towing, 442 Mass. at 86).

When the municipality's conduct constitutes governmental activity, the municipality is protected from liability under c. 93A because "it is well-established that governmental entities are

14

not amenable to suit under c. 93A when they have engaged in governmental activity rather than trade or commerce." M. O'Connor Contracting, 61 Mass. App. Ct. at 284.

No Massachusetts appellate court has found a city to have engaged in trade or commerce under c. 93A, but the many cases that determine that a municipality was not so engaged make it entirely clear that the Plaintiff has not plausibly alleged that the City engaged in trade or commerce in this case by imposing a fee on restaurants seeking licenses to expand their licensed restaurant premises onto the public way in the North End. To qualify as trade or commerce, conduct must take place in a "business context," which is determined by considering "the nature of the transaction, the character of the parties involved and [their] activities ... and whether the transaction [was] motivated by business ... reasons." Park Drive Towing, 442 Mass. at 86 (quoting Boston Hous. Authy. v. Howard, 427 Mass. 537, 538 (1998)); All Seasons Servs., Inc. v. Commissioner of Health and Hospitals of Boston, 416 Mass. 269, 271 (1993). Applying those considerations in the municipal context, the Supreme Judicial Court has adhered to a principle that a municipality is not engaged in trade or commerce where the municipality does not seek to profit from a transaction and where the contract is part of or incidental to its ordinary municipal activities. Howard, 427 Mass. at 539, 540 (holding that the Boston Housing Authority was not engaged in trade or commerce when it rented an apartment to the defendant resident). Thus, the appellate courts repeatedly find that actions by municipalities have not occurred in a business context.

For example, when the Boston City Hospital granted a vending machine company the exclusive right to operate food vending machines in the hospital, the court held that the hospital was not engaged in trade or commerce because it was not seeking to make a profit and the contract was merely incidental to its primary function of providing medical services. See All Seasons Servs., 416 Mass. at 271. Where a claim arose from a city's contracting for the construction of a

15

municipal building, the claim arose from a "governmental function" and was not amenable to c. 93A.  M. O'Connor Contracting, 61 Mass. App. Ct. at 284–85.  In another case where a city allegedly terminated a contract to tow illegally parked cars, the SJC rejected a c. 93A claim because the transaction was "merely incidental to [the city's] primary function of maintaining order in the streets."  Park Drive Towing, 442 Mass. at 86.  Even running a lottery to generate revenue is not acting in the business context when the revenue goes to the state and the lottery is operated at legislative mandate rather than personal or business objectives.  Bretton v. State Lottery Commn., 41 Mass. App. Ct. 736, 739–40 (1996).

Although no Massachusetts court has held that a municipality was engaged in trade or commerce for the purposes of c. 93A, the City acknowledges that the United States District Court for the District of Massachusetts so found in a 2006 decision.  City of Revere v. Boston/Logan Airport Associates, LLC., 443 F. Supp. 2d 121, 129 (D. Mass. 2006).  In that case the court determined that the City of Revere had acted in a business context when it sought to enforce an easement on a piece of property that it had acquired through a tax taking because that action would allow it to secure more money for the sale of the property than it would otherwise obtain if it did not enforce the easement against the plaintiff.  Id.  This case is readily distinguishable because the City of Revere was looking to increase its profits from a land transaction.  Here the City is performing a primary governmental function of operating a regulatory scheme for licensing temporary licensed premises extensions.  The City of Revere decision seeks to distinguish the long line of Massachusetts cases that have found that a city was not engaged in trade or commerce by suggesting that those cases involved clearer statutory mandates, transactions more clearly related to a municipality's primary functions, or less profit.  In the context of the instant case, cities have a statutory mandate to regulate economic activity, and more specifically, to regulate outdoor dining

16

on City streets, and an examination of binding Massachusetts precedent supports a conclusion that

dismissal of Count 4 is appropriate, especially given the governmental purpose at issue here.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court must grant Mayor Michelle Wu's Motion to Dismiss.


Dated:  August 1, 2022                          Respectfully submitted:

                                                **MAYOR MICHELLE WU**

                                                By her attorneys:

                                                Adam N. Cederbaum
                                                Corporation Counsel


                                                */s/ Nicole M. O'Connor*
                                                Robert Arcangeli (BBO#689034)
                                                Nicole M. O'Connor (BBO#675535)
                                                Senior Assistants Corporation Counsel
                                                City of Boston Law Department
                                                City Hall, Room 615
                                                Boston, MA 02201
                                                (617) 635-4044 (Arcangeli)
                                                (617) 635-4039 (O'Connor)
                                                Robert.arcangeli@boston.gov
                                                Nicole.oconnor@boston.gov

## 7.1 CERTIFICATION

I, Nicole M. O'Connor, hereby certify that I conferred with counsel for plaintiffs, Richard Chambers, via telephone conference on August 1, 2022 in an effort to resolve or narrow the issues raised herein.  The parties were unable to resolve or narrow the issues.

Dated:  August 1, 2022                             */s/ Nicole M. O'Connor*
                                                                        Nicole M. O'Connor


## CERTIFICATE OF SERVICE

I, Nicole M. O'Connor, hereby certify that I served a true copy of the above document upon all parties of record via this court's electronic filing system and upon any non-registered participants via first class mail on the date listed below.

Dated: August 1, 2022                             */s/ Nicole M. O'Connor*
                                                                        Nicole M. O'Connor