UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**JORGE MENDOZA;**
**CARLA GOMES;**
**CHRISTIAN SILVESTRI;**
**PATRICK MENDOZA.**
        Plaintiffs,
        v.

**MICHELLE WU, in her capacity as**
**Mayor of the City of Boston**
        Defendant.

Civil Action No.: 1:22-cv-10710-IT

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**Richard C. Chambers, Jr., Esq.**
**BBO#: 651251**
**Chambers Law Office**
**220 Broadway, Suite 404**
**Lynnfield, MA  01940**
**Office: (781) 581-2031**
**Cell: (781) 363-1773**
**Fax: (781) 581-8449**
**Email: Richard@chamberslawoffice.com**

# TABLE OF CONTENTS

1.  Salient Facts ...                                                    4

2.  Argument ...                                                         6

3.  Plaintiffs' Have Standing ...                                        6

4.  Plaintiffs Have Stated a Claim ...                                   8

    (a)  Plaintiffs Have Stated an Equal Protection Claim ...           8

    (b)  Plaintiffs Have Stated a Due Process Claim ...                 19

5.  Defendant Has Violated the Commerce Clause ...                       22

6.  Defendant Is Liable Under M.G.L. Chapter 93A ...                     24

7   Conclusion ...                                                       26

# TABLE OF AUTHORITIES

## Cases

*Alliance of Automobile Manufacturers v. Gwadosky*, 430 F.3d 30 (1st Cir. 2005) ...   23

*City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432 (1985)* ...            15

*City of Revere v. Boston/Logan Airport Associates, LLC,* 416 F.Supp.2d 200 ...        25

*City of Revere v. Boston/Logan Airport Associates, LLC,*

         443 F.Supp.2d, 121 (D.Mass. 2006) ...   24

*Coolidge v. Inhabitants of Brookline*, 114 Mass. 592 (1874) ...                       21

*Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1 (1st Cir. 2011) ...                      21

*Massachusetts Boad of Retirement v. Murgia*, 427 U.S. 307 (1976) ...                  10

*Montalvo-Huertas v. Rivera-Cruz*, 885 F.2d 971, (1st Cir. 1989) ...                   10

*Pagan v. Calderon*, 448 F.3d 16 (1st Cir. 2006) ...                                   21

*Park Drive Towing, Inc v. City of Revere*, 442 Mass. 80 (2004) ...                    24

*Pignato v. Dein Host, Inc.*, 835 F.2d 402 (1st Cir. 1987) ...                         7

*Railway Express Agency, Inc. v. People of State of New York*, 336 U.S. 106, (1949) ...    17

*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978) ...    10

*Wessman v. Gittens*, 60 F.3d 790, 794 (1st Cir. 1998) ...    10

## **Massachusetts Constitutional Provisions**

*Massachusetts Declaration of Rights*

ART. I ...    9

ART. XIX ...    20

## **Other Authorities**

*Black's Law Dictionary* ...    15

*Merriam-Webster Dictionary* ...    15

The Defendant, Michelle Wu, in her capacity as Mayor of the City of Boston, (hereinafter, "Mayor Wu" or "Defendant") has moved via Motion, to dismiss this action pursuant to Rule 12 of the Federal Rules of Civil Procedure. In the body of her *Motion to Dismiss* at pp. 1-2, the Defendant cites three (3) reasons for her Motion: (1) Plaintiffs' lack standing because damages associated with the licensing fees at issue in the case do not personally affect the Plaintiffs, but only the restaurants they own and operate; (2) If the Court finds the Plaintiffs have standing, the complaint must still be dismissed "as a matter of law" because the discriminatory licensing fees at issue are related to a "legitimate interest" the City of Boston (hereinafter, the "City") has in dealing with health-like problems and "lost parking for residents" "in this unique and densely-situated area of the City", and (3) any Massachusetts General Laws Chapter 93A claims fail because the Defendant was not engaging in trade or commerce when they imposed the discriminatory licensing fees for the restaurants located in the North End. The Defendant makes additional claims for dismissal of Counts in her *Memorandum*, attached to the *Motion*, however, these claims are not named in the Motion and ought to be ignored by the Court, although, Plaintiff responds. In any event, Plaintiffs oppose the *Motion* and suggest it ought to be dismissed in its entirety.

1. **Salient Facts.**

In short, the Complaint in this case is about the licensing fees the Plaintiffs are being charged by the Defendant in order for the Plaintiffs to have outdoor dining at their Italian restaurants located in Boston's North End area, while all other restaurants in the City of Boston do not have to pay these same special fees for a license to operate outdoor dining in their businesses. In her Motion, the Defendant states that this discrimination against the North End's

<u>Italian</u> restaurants is warranted because the area is "unique" and "densely populated" and the outside dining in the area requires "increased rodent control" and "street cleaning". [1]

Should this instant case proceed to trial and facts were testified to under oath, Plaintiffs believe that they could show the Defendant's claims about the fees are meritless. In fact, to date and to the best of the Plaintiffs' information and knowledge, Mayor Wu has failed to <u>specifically</u> account for as to how the fees were used. The examples given by the Defendant, including, rodent control and street cleaning, would be shown by evidence to be completely misleading. In the case of "street cleaning", the City of Boston already has money allocated to do regular street cleaning in the North End. There is no need for <u>extra</u> street cleaning in the area of the North End restaurants, as the Plaintiffs will prove, since all the restaurants with outdoor dining clean their own areas on a daily basis, many with power washers.[2] With respect to "rodent control", Plaintiffs will show that there is no conceivable need for any increased rodent control in the North End due to outdoor dining, and whatever so-called rodent control the Defendant has been taking previous to outdoor dining is sufficient. [3] Moreover, Plaintiffs will show that the North End borders on Boston Harbor, and harbor areas are historically known to attract more rodents whether or not there is a presence of restaurants. Plaintiffs will additionally show at a trial that there is no reliable evidence that there is an excessive rodent problem exclusive to the North End. The Plaintiffs will also show that other nearby cities, such as the City of Cambridge, recently experienced its own notorious rodent problem, which is not claimed to be associated

---

[1] The Seven Thousand and Five Hundred Dollar ("$7,500.00") licensing fee is applied for these alleged "increased" City services, while the smaller use of parking space fees is allegedly used to provide additional parking spaces for residents at local parking garages.
[2] It is absurd to believe that restaurant establishments would fail to keep their premises clean and sanitary, especially in the highly competitive North End.
[3] Plaintiffs are not aware of any so-called rodent control measures the City of Boston in fact implemented in the North End.

with outdoor dining, and that such rodent problems are common throughout all cities. Additionally, Haymarket, which borders the North End, allows outdoor food "pushcarts" that recently has been attracting inordinate amounts of rodents and has created its own rodent problem for the area. See, **"Exhibit B"**, Photos of Haymarket.

Plaintiffs will also offer proof at a trial that other areas of the City of Boson are relatively as dense as the North End and equally have parking problems. The primary and most relevant example would be the Maverick area of East Boston, just several hundred yards from the border of the North End. This East Boston area is strewn with overwhelmingly Hispanic and Latino restaurants, who are the overwhelming majority of residents, and many of whom have outdoor dining but are not subject to the same discriminatory fees as the Italian restaurants in the North End. [4]. See, **"Exhibit A"**, Photos of Maverick Square Area.

## **ARGUMENT**

In Mayor Wu's Memorandum of Law (hereinafter, "Memo"), she makes several arguments in support of her Motion to Dismiss. Plaintiffs will address them in the same order that they are made therein.

## 2.    **Standing.**

In Defendant's opinion, the Plaintiffs lack standing because they suffered no personal loss paying the discriminatory fees since the "entire Complaint is premised upon purported

---

[4] The Plaintiffs will offer evidence that Hispanics and Latinos far outnumber those of Italian heritage in the City of Boston, by approximately 100%, and consequently hold greater political weight than the minority Italians.

injuries to their *restaurants* due to the fees imposed by the Order." Memo at 5 (Emphasis supplied).

The Plaintiffs own, operate and work in the restaurants that are at issue in this case. They make their livelihood from working in their restaurants. If the restaurant makes money, Plaintiffs make money. If the restaurants lose money, the Plaintiffs lose money. Any corporate status that might apply is merely a legal fiction or nicety to protect their businesses.

To begin, Defendant relies on *Pignato v. Dein Host, Inc.*, 835 F.2d 402 (1ˢᵗ Cir. 1987), a complicated case dealing with bankruptcy issues and *appellate standing* in bankruptcy cases to challenge lower court rulings 835 F.2d at 405. In that case, the Appellant was merely a shareholder, and his interests were not "'directly and adversely affected pecuniarily'". The Appellant lacked standing because he did not claim on appeal that his property had been diminished, that his burdens were increased, or his rights had been impaired. *Id.* Plaintiffs contend *Pignato* does not apply to this cause of action since the Plaintiffs all have a personal stake in their restaurants and they earn their living from them. Moreover, the case involved standing to appear before an Appellate Court and not to file a civil action.

The theme of the cases relied upon by the Defendant for her arguments for dismissal because of a lack of standing all relate to *stockholders* in a corporation and the *diminishment of the value of their stock*. Only in that sense would those cases apply, which is not what this Court is dealing with in the instant case. The Plaintiffs in this case brought this action in their own names, not the names of corporations. Moreover, they have a direct stake in the outcome of the case. The licensing fee they paid literally came out of their own pockets, because all profits and losses of their restaurants directly affect their own income and losses and, in fact, is their source

of income. Therefore, the "lack-of-standing argument" of the Defendant is meritless and has no basis in fact or law.

3.   **Failure to State a Claim.**

Next, Defendant argues in her Memo that Plaintiffs have failed to state an Equal Protection, Due Process, or Commerce Clause claim, and that Massachusetts General Law Chapter 93A does not apply. *Id*. 5-17. We review these claims seriatim.

(a) **Equal Protection**.

Defendant "presume[s]", Memo at 5, that Plaintiffs' Equal Protection claim is based on "the fact that the timing, fees, and parking requirements for on-street licenses in the North End are different than for other neighborhoods of Boston." Defendant claims they have drawn a "distinction" that is "rationally related" to protecting the "quality of life" in the North End and therefore the Equal Protection claim fails. Plaintiffs disagree and state this presumption is incorrect.

Initially, the Defendant has not recognized, in any of her arguments, that the City of Boston has definitely made a "new class" in Equal Protection terms. Science, and all people who live and have lived, recognize that all people on Earth are human beings. Sometime in history, human beings were placed into racial classes, e.g., Asians, Blacks, Whites, etc. Nevertheless, all people are human beings. Mayor Wu has also made a new classification as someone in history did with respect to human beings: she has taken restaurants in Boston (the human being factor) and divided them into two (2) classes, i.e., the overwhelmingly Italian restaurants in the North End and all other restaurants in other parts of the City of Boston (the racial factor). However, a restaurant is a restaurant "is a restaurant", and Plaintiffs contend they are all similarly situated in

their quest to make a living for the owners and their employees (similar to all people being human beings). What the Defendant calls a "distinction" is certainly akin to a racial distinction made in other Equal Protection cases. It is difficult to understand on another front how the "quality of life" in other areas of Boston, such as the Maverick section of East Boston, are not equal to that of the North End and how any regulation that differentiates between the two classes can be "rationally related" to any public interest. In the case of the Maverick Square area of East Boston, which is predominantly Hispanic and Latino, that area of the city does not have the discriminatory fee for outdoor dining, it is equal to a racial discrimination case because the restaurants in the North End are owned and operated by Italians but have to pay the outdoor licensing fee. Thus, the Defendant has made a regulation that on its face, in the case of the North End and Maverick comparison, that makes a distinction between two (2) or more nationalities and/or ethnicities: that is, between the predominantly Italian-owned and operated restaurants in Boston's "Italian North End" and the predominantly Hispanic/Latino owned and operated restaurants in the nearby Maverick area.[5] It is well-known that Supreme Court jurisprudence and Federal statutes that deal with discriminatory practices encompass those that violate rights relative to national origin, although such is not specially mentioned in the United States Constitution. However, the Commonwealth, in their Declaration of Rights, long ago mandated: "Equality under the law shall not be denied or abridged because of sex, race, color, creed or *national origin*." Art. I (Emphasis supplied).

The Defendant, in her Memo at Page 5, wrongly makes a quote from a Second Circuit case that implies Plaintiffs have not alleged an "'equal protection violation ... without also

---

[5] Counsel and his staff have conducted a preliminary internet search and have discovered official and unofficial data that show Hispanics/Latinos make up approximately 19% of the population of the City of Boston and that Italians approximately 9.5%.

alleging discrimination based upon membership in a protected class'". [6] It is without question that national origin and/or ethnicity, in the instant case, Italian, is a suspect class. When a suspect class is involved in a governmental action, "strict scrutiny" analysis is warranted in equal protection claims. *Massachusetts Boad of Retirement v. Murgia*, 427 U.S. 307, 312 (1976). *Also see, Montalvo-Huertas v. Rivera-Cruz*, 885 F.2d 971, 976-977 (1st Cir. 1989) (national origin cases are determined under strict scrutiny analysis). In *Regents of the University of California v. Bakke*, 438 U.S. 265, 357 (1978) the Court said, "Unquestionably we have held that a government practice or statute which restricts 'fundamental rights' or which contains "suspect classifications" is to be subjected to 'strict scrutiny' and can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available." *See also, Wessman v. Gittens*, 60 F.3d 790, 794 (1st Cir. 1998) (strict scrutiny analysis requires a showing of "a compelling governmental interest and narrowly tailored to serve that interest in order to stand").

Looking fairly at the fee requirement of $7,500.00 for each restaurant in the North End under a strict scrutiny analysis, it is impossible to determine why such a fee should be required, especially since no other neighborhood restaurants in the City of Boston are subjected to the same fee for a license to have outdoor dining. In Defendant's Memo, she claims the fee is needed for rodent control and street cleaning. Such a claim is dubious at best, since the City routinely does rodent control and street cleaning without any extra charges and in neighborhoods without restaurants. It is without question that the City of Boston could not produce one scintilla of evidence that it is required to <u>legitimately</u> spend more resources to pursue so-called rodent

---

[6] The Complaint at ¶ 8 avers that the $7,500.00 fee did not apply to any other area of Boston except the Italian North End.

control or extra street cleaning in the Italian North End because of outdoor dining. Even if the Defendant wanted to claim that the City had to spend a small sum on a few workers and equipment for a day or two to make Hanover Street, the main thoroughfare of the North End, amenable to potential traffic problems, such would not justify the fee since the City does the same thing throughout the year for events and functions that comes directly out of the City's budget.[7] In other words, the City does not go around charging local businesses fees for performing work that the City normally does in the course of maintaining the City and protecting the public around the local businesses. The costs of performing all these tasks are already paid for by taxes. Thus, there is not a compelling interest in the City charging the Plaintiffs and other restaurant owners in the North End a $7,500.00 fee for a license to have outdoor dining. More importantly, there was available a "less restrictive alternative". The City could have just charged for the use of parking spaces that each restaurant commandeered. In that case, the City has a more compelling argument that taking up parking spaces might have the effect of disrupting neighborhood parking.

In the final analysis, Plaintiffs claim that the fee order ought to be reviewed under a strict scrutiny criteria and under that test, the fee requirement ought to be held unconstitutional.

While Plaintiffs' position is that the Court should decide the constitutional claims under a strict scrutiny analysis, the Defendant's sole argument encompasses the less harsh "rational basis" analysis. However, if this Court adopts Plaintiffs' suggestion that the Motion be considered via strict scrutiny and thereby strikes down the fees as unconstitutional, then that is the end of the matter. In the event this Court rejects Plaintiffs' argument, then Plaintiffs respond to Defendant's rational basis argument as follows.

---

[7] Some or all of the Plaintiffs' restaurants are not on Hanover Street.

Defendant claims that it is the location of the restaurants in this case that require the discriminatory fee be assessed for North End establishments and not for other sections of the City *Memo* at 5. However, nowhere has Mayor Wu explained why a $7,500.00 licensing fee for only North End restaurants will ameliorate this alleged location problem. In fact, how can a fee remedy a location problem? Again, using the Maverick Square area restaurants as just one comparison, several restaurants have outdoor dining not only in parking spaces, but also on busy sidewalks that presumably have nearly as much pedestrian traffic as does the North End.[8] However, the City has turned a blind eye to any perceived similar problem the Maverick Square area restaurants caused within the East Boston neighborhood and have not charged those restaurants a $7,500.00 fee as they have the North End Italian restaurateurs. What this says is that there has to be another undisclosed reason for charging the fee only to the North End restaurants, since the stated reason, "location", is illogical. That is, the $7,500.00 fee does not bring back the parking spaces nor does it ameliorate any inconvenience to pedestrians in packed neighborhoods! It fails to solve the so-called location problem in any sense. It simply creates one: a discrimination problem.

Moreover, as the attached photos demonstrate, the Newbury Street area of the Back Bay area of Boston has many restaurants with outdoor dining, none of whom are paying the unequal $7,500.00 licensing fee nor the Four Hundred and Eighty Dollar ("$480.00") fee for parking spaces commandeered. See, **"Exhibit C"**, Photos of Newbury Street. As a tour of the Back Bay area and Newbury Street demonstrates, street parking is at a premium and precious spaces have

---

[8] The Taco Mex restaurant is located in Maverick Square, just yards from the Maverick MBTA Blue Line station, which is the busiest stop on the Blue Line, has its seating on the sidewalk, and perhaps tens of thousands of pedestrians pass through the cramped Maverick Square on a daily basis, arguably more than on Hanover Street.

been taken up by outdoor dining, all to the detriment of the residents, exactly analogous to that of the North End. The sections with outdoor dining have narrowed Newbury Street, also similar to that of Hanover Street in the North End and traffic has suffered accordingly, both automotive and pedestrian traffic. Newbury Street is also highly traveled and is a tourist attraction, similar to the North End. The only difference in the two (2) streets, as far as can be discerned by an objective observer, is that Newbury Street residents, merchants and restauranteurs are high-class and wealthy and a power to be reckoned with, while their North End counterparts are not. This situation has a strong odor of a financial class distinction: i.e., Rich v. Poor.

Parenthetically speaking, we note that it is the Defendant's position that having outdoor dining in the North End post-pandemic allegedly created a host of problems for the neighborhood, which, Defendant dubiously claims, can be solved by charging the discriminatory $7,500.00 fee. These alleged problems are bad for the densely packed North End neighborhood. In that case, if outdoor dining creates all these problems, then why has the Defendant permitted it at all? Why stoke all the controversy and discrimination? How does any of this benefit the City and its constituents? It is impossible to discern. An objective observer could easily suspect that the discriminatory actions against North End restaurateurs is a sham done for other political reasons.

Be that as it may, Defendant, under the "rational basis" standard, must demonstrate that there are "reasonably conceivable" facts that provide a rational basis for charging the North End restauranteurs a $7,500.00 licensing fee for outdoor dining while failing to charge those same fees to the greater number of restaurants outside the North End. Also encompassed in the test is that the established facts then have a "rational relationship" to the "government's legitimate

ends." However, while meeting those standards would give the regulation a "presumption of rationality" the presumption can be overcome by showing "arbitrariness and irrationality." *Montalvo-Huertas v. Rivera-Cruz*, 885 F.2d 971, 978 (1st Cir. 1989).

In order to argue this standard, Defendant "propose[s]", Memo at 8, several bases for the $7,500.00 fee.[9] Then, as argued below, when the Plaintiffs went to complain about the fees in person at a City Hall meeting about outdoor dining, the Defendant's agents shut Plaintiffs out of the meeting and only allowed the North End restauranteurs who were not complaining about the fees to attend. Defendant's list of "reasonably conceivable" reasons are: (a) "to defray its mitigation costs and to replace lost resident parking", Memo at 8, (b) outdoor dining "creates increased trash, traffic, … rodent problems …" and increases "costs to the City such as redoing street markings, increasing licensing enforcement where capacity has increased, cleaning streets and sidewalks, rodent control, and parking enforcement", *id*. (c) the North End proportionally has more restaurants than other sections of the City, that the North End has "narrow sidewalks" and "high pedestrian volume" and that such is impacted by outdoor dining in parking spaces, *id*. and (d) outdoor dining in the North End "poses a significant quality of life burden in the form of aggregate noise, trash, traffic," sidewalk use and parking loss, that is not experienced by other neighborhoods". These are the "reasonably conceivable" facts that the Defendant asks this Court to find that could be, but are not claimed to actually be, behind the $7,500.00 discriminatory fee

---

[9] It should be noted that nowhere in her arguments does Mayor Wu state the actual reason she charged the North End restaurants the fee in question; she only proposes possible reasons she could have charged the fee. It should be considered a fact against them that she will not so state. Moreover, note that the Complaint avers that when the regulations for outdoor dining were being discussed with the Plaintiffs and others, City officials never mentioned anything about charging the North End restaurants alone a licensing fee. This information only came in the 11th hour via a video meeting.

charged to the Plaintiffs and all North End restauranteurs who are licensed to have outdoor dining.

Of course, the term "rational" encompasses the word "reasonable." *See, e.g., Merriam-Webster Dictionary* (having reason or understanding; relating to, based on, or agreeable to reason); *Black's Law Dictionary* (behavior guided by reasoning and not by emotions; a thinking process that uses logical, systematic methods in drawing a conclusion. ...). In his concurrence in *City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432 (1985)*, Justice Stevens, with the concurrence of the Chief Justice, defined the word "rational" as including "a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. Thus, the word "rational" includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially." *Id*. 452. *Merriam-Webster* defines "reasonable" as "being in accordance with reason; not extreme or excessive; moderate, fair; inexpensive." *Black's Law Dictionary* defines reasonable as "agreeable to reason; just; proper; Ordinary or usual."

First of all, any of the Defendant's arguments relating to parking spaces and the defraying of those costs to the North End restaurants are irrelevant to this Court's decision-making process because the Defendant herself did not include the parking space fee in the $7,500.00 fee but made it a separate fee. *See,* Complaint, at ¶ 7 (parking space fee is $480.00 per month).

Second, Defendant claims that outdoor dining in the North End created more "trash" "traffic" and "rodent problems". That is an outrageous claim and not true. This claim is baseless and could never be sustained under oath because traffic is the same as always in the North End and has absolutely nothing to do with outdoor dining (the overwhelming majority of restaurant

15

customers historically either walk into the North End or arrive via taxi, Uber, etc., since there are very few parking garages). Restaurants have no more trash than usual, since all outside dining did was to move diners outside instead of inside and there has not been a scintilla of evidence presented that any alleged rodent problem has increased with outdoor dining, especially since each restaurant thoroughly cleans their own area on a daily basis. As to the City's extra cost to cleaning streets, rodent control and parking enforcement, there is no evidence whatsoever that the City has been doing anything more than it usually does to combat these regular City problems and they have not pointed to what *legitimate* cost increases they have expended.[10] As to some cost in "redoing street markings" on a very small portion of Hanover Street, such was the City's decision, took only a few hours, was not actually necessary in relation to outdoor dining, and certainly did not require charging exorbitant fees in the hundreds of thousands of dollars.

Third, Defendant simply states that the North End proportionally has more restaurants than other parts of the City of Boston, narrow sidewalks, high pedestrian traffic, and these conditions are impacted by outdoor dining. Whether or not that statement is true or not, it has nothing whatsoever to do with rationalizing paying a discriminatory fee of $7,500.00. Many areas of the City have the same conditions as stated by the Defendant, for example, the Maverick Square area of East Boston, but those facts alone cannot rationally be a basis for charging a special fee in addition to a business' regular taxes. In that regard, the Plaintiffs already are taxed through their business and personal taxes for street cleaning, rodent control, traffic and parking enforcement, street signage, etc., however, Mayor Wu wants only them to pay a second time and

---

[10] On or about August 11, 2022, the City issued a report on the money they spent in the North End this year, it is unknown at this time if there really was any increase from former years and whether or not any increase that could be discerned was warranted because of outdoor dining.

more than what other citizens and businesses do, like the residents of the North End and businesses who are not restaurants but benefit from the customers that the Plaintiffs' and other restaurants bring into the area. This is unequal treatment.

Finally, Defendant claims as a reason for the $7,500.00 discriminatory fee as a "rational relationship" to the "government's legitimate ends" that outdoor dining in the North End "poses a significant quality of life burden in the form of aggregate noise, trash, traffic," that is not experienced by other neighborhoods. Be that as it may one way or the other (and Plaintiffs contend that none of these conditions prevail), how does charging a fee of $7,500.00 ameliorate these conditions? Again, an objective factfinder opining these claims, without having any actual facts before them, would be highly constrained to rationally say that charging an extra fee to singled-out businesses in some way helps the legitimate ends of government to deal with these problems. Not only does charging the exorbitant $7,500.00 fee make no sense, it does not even make non-sense.

The words of Justice Jackson in his 1949 concurrence in *Railway Express Agency, Inc. v. People of State of New York*, 336 U.S. 106, 112-113 (1949) so aptly apply to the instant Equal Protection claim as it did in that case:

> [N]othing opens the door to arbitrary action so effectively as to allow … officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected.

Plaintiffs claim this is exactly what is going on in the instant case: Even if the $7,500.00 fee could by some stretch of the imagination be justified, then it ought to be enforced evenly throughout the City, like in the densely populated Maverick Square area, but, for political reasons, that would not be in the Defendant's interests. Boston has at least twice as many

Hispanic-Latino residents than there are Italians residents, and therefore the former are not the class/nationality one wants to rile up if seeking political office.

In the final analysis, Plaintiffs assert that only one thing has changed in the North End with the implementation of outdoor dining: Several dozen parking spaces on the streets have been commandeered for tables. Pedestrian traffic is the same, motor vehicle traffic is the same, rodent population is the same, noise is the same, etc. If the Defendant and her staff had just based an extra reasonable fee on the loss of parking spaces *alone*, it is conceivable that Defendant could have made a standing-alone convincing argument that the $480.00 fee for each parking space had a rational relationship to a legitimate government end, however, Mayor Wu went overboard in charging the $7,500.00 fee that they are not charging any other restaurant in other areas of the City, all without any rational reason, except, perhaps, political reasons. The Defendant has made two (2) classes of restaurants in the City, those in the North End and those that are not, and then treated them unequally when it comes to outdoor dining. Plaintiffs submit that this is a violation of the Equal Protection Clause for all the above stated reasons.

Finally, Plaintiffs urge the Court to take note that Defendant has failed to argue the significant loss of business mentioned in Paragraph 22 of the Complaint; that is, Plaintiffs and other North End restauranteurs were treated unequally in that they had a later starting date and earlier ending date for outdoor dining than other City restaurants, resulting in a loss of revenue because they could not compete with other restaurants that had outdoor dining during that time. This is rank unequal treatment under the Constitution and Defendant has not offered any excuse for such disparate treatment in their Motion.

**(b)    Due Process.**

Defendant asserts that Plaintiffs have failed to make *any* Due Process claim and therefore the Due Process portion of the Complaint ought to be dismissed. The Defendant's Motion on this issue is meritless, has no basis in fact or law and ought be denied.

A review of the facts from the Complaint, at ¶¶ 18-21, are warranted. Prior to the Order at issue in this case about outdoor dining being handed down, Mayor Wu, though her staff, assembled a committee of restaurant owners to discuss how outdoor dining would be conducted for 2022. Although Plaintiffs were not actual members of the committee, they were allegedly regularly apprised of the committee's discussions by both committee members and City staff. During all of the meetings with the committee, City staff failed to mention anything about an outdoor dining order that would involve fees. Subsequently, the City staff sent out public notice that they were going to a hold Zoom meeting relative to an Order they were issuing about outdoor dining. Most of the Plaintiffs signed on to the Zoom meeting. During this Zoom meeting, for the first time, it was announced that the City was going to charge the North End restaurants a $7,500.00 fee for a license to conduct outdoor dining at their restaurants. There were protests during the Zoom meeting.[11] Shortly after the fees were announced, the committee and City officials held another meeting in the City Hall to discuss the Order. Plaintiffs and other North End restauranteurs went to City Hall in order to attend this open meeting and protest the fees to the committee and City officials. Upon seeing the large contingent of protesters, City officials switched the meeting room to a smaller room. City officials then allowed into the room

---

[11] As far as the Plaintiffs know, no other restauranteur were notified in writing about the fees.

only those North End restauranteurs who were not protesting the fees, excluding those who were indicating they opposed the fees, which included some, if not all of the Plaintiffs.

The Due Process claim *primarily* focuses on the above incident. However, it goes beyond that. While the Defendant claims "there exists no fundamental right to operate a restaurant and there is certainly no fundamental right to extend the restaurant on the public right of way", *Memo* at 12, we beg to differ. The right to operate a restaurant and have the same right as others to extend it onto a public way is enshrined into Art. I of the Massachusetts Declaration of Rights, which states:

> All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin.

When the fee order came down, the Plaintiffs had an absolute right under Art. I to protect and defend their restaurants. They had a right to complain about the fee and to ask for equal treatment for their North End restaurants as that which was being accorded to restaurants in other sections of the City. Thus, they do have a fundamental right under the Massachusetts Constitution to "operate a restaurant" and they do have a right to extend it onto a public way if other restaurants are being allowed to do so.

Even more important to the instant issue is Art. XIX of the Declaration of Rights.

> The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer.

*See Coolidge v. Inhabitants of Brookline*, 114 Mass. 592,599 (1874) (holding that Art. XIX guarantees to the people the right to assemble and petition for redress of grievances and "inform the Legislature of their wishes"). Under Art. XIX and the teaching of *Coolidge* Plaintiffs had a due process right to be heard when they went to City Hall since it was a public meeting called by City officials concerning the fees and outdoor dining, but officials barred them from the public hearing they had initiated.

As the Complaint asserts, upon learning that the Defendant and her agents had decided that they were going to discriminatorily charge the North End restaurants a $7,500.00 fee for a license to operate outdoors, Plaintiffs assembled and went to the City Hall meeting where officials were going to discuss outdoor dining. Plaintiffs wanted to and attempted to exercise their constitutional right to "instruct[] their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, [to] redress [] the wrong done them". Seeing that some of the people who were opposed to the fee were about to enter the chamber where the hearing was being conducted, Mayor Wu's agents suddenly changed the meeting to a smaller room that would not accommodate all the people. City Officials then allowed a few North End restauranteurs to attend the meeting, picking and choosing who could enter, but denied entrance to those who were protesting the fee and wanted to be heard in opposition, using a police force to bar their entrance.

That behavior by officials is outrageous and "particularly offensive", *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006). Therefore, it meets the substantive component of a Due Process claim.

To use another case cited by the Defendant in relationship to the procedural due process component, *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) the process due

must be "constitutionally adequate". What the Defendant left out of her reliance on that case is that the court then went on to say that a "basic guarantee of procedural due process" is that before a government deprives a person of their property (in this case, income from outdoor dining), they must be given "an opportunity to be heard at 'a meaningful time and in a meaningful manner.'" *Id.* (cites omitted). In the instant case the Defendant notified the North End restauranteurs that they were going to hold a meeting relative to, *inter alia*, the outdoor dining fees. All, or some of the Plaintiffs, showed up to attend the meeting. Learning in a hallway of City Hall that the Plaintiffs were opposed to the fees, Mayor Wu's agents shut out those Plaintiffs from attending the meeting. Such action denied the Plaintiffs their Due Process rights under both components. Moreover, the right to attend that meeting is specifically granted to Plaintiffs under the exact language of the Massachusetts Declaration of Rights.

## 4.  **Commerce Clause.**

The North End is an economic bonanza to the Commonwealth and, in a sense, to some national business enterprises that either transport tourists or arrange for trips into Boston or supply establishments that do business there. It is public knowledge that the Freedom Trail runs through the heart of the Italian North End. The Freedom Trail begins in the Boston Common and ends in Charlestown at the U.S.S. Constitution, winding 2.5-miles down Hanover Street in the North End to visit the Paul Revere House at 19 North Square and Old North Church at 193 Salem Street situated in the North End. The Freedom Trail is believed to be run by the National Park Service. Estimates are that approximately four million ("4,000,000) people visit the Freedom Trail each year and that it's "a world-renowned, signature tourist experience". See https://www.thefreedomtrail.org/about.

Thus, tourists come from all around the country and world to the Freedom Trail and it is arguably the most popular tourist attraction in all of New England. The Italian North End restaurants are intricately involved in the tourist commerce of the United States since a great number of tourists who visit the Freedom Trail also patronize the dozens of restaurants along its route in the North End. To interfere with the North End restaurants is to interfere in the commerce protected by the United States Constitution.

"A state statute that has no direct extraterritorial reach but that discriminates against interstate commerce on its face, in purpose, or in effect, receives a form of strict scrutiny so rigorous that it is usually fatal" *Alliance of Automobile Manufacturers v. Gwadosky*, 430 F.3d 30, 35 (1st Cir. 2005).

Outside dining is highly attractive to most diners in the warmer months. A diner is more likely to patronize a restaurant with outdoor dining than one without. North End restaurants on the Freedom Trail opted-in almost immediately to have outdoor dining to further attract the tourist trade and paid the $7,500.00 fee. In order to compete with the Freedom Trail restaurants with outdoor dining the Plaintiffs, whose restaurants are not on the Freedom Trail, were forced to submit to the $7,500.00 fee. This is a form of extortion: pay the fee or you cannot have outdoor dining and consequently will not have as many customers as those restaurants who pay the fee, which generally are the larger restaurants on Hanover Street, whose businesses are more lucrative because of the Freedom Trail. In "effect" the requirement of the $7,500.00 fee "discriminates against interstate commerce" because it is entwined with the tourist trade of the North End. Four million people walk through the North End each year, presumably the majority in the summer. Many of them want to eat out in the local restaurants, the majority choosing to dine outside. Plaintiffs are forced to have outdoor dining in order to compete with the other

restaurants catering to the tourist trade in order to share in the four million tourists per year who are spending money in the North End. The order pertaining to the $7,500.00 fee consequently indirectly impacts the commerce of the tourist trade in the City of Boston, particularly in the North End where the overwhelming majority of tourists pass through. In that respect, then, it is unconstitutional.

The Order also impacts the tourist commerce because it has restricted outdoor dining in the North End by several months less than outdoor dining in other sections of the City. Thus, tourists who visit Boston from around the country and world and who prefer to eat outdoors will patronize restaurants outside the North End during the months when the North End restaurants are forbidden to have outdoor dining. This is also a violation of the Commerce Clause.

5.    **Massachusetts General Laws Chapter 93A.**

Defendant argues that the Massachusetts General Laws Chapter 93A count must be dismissed because there is not enough evidence that "the City was engaged in trade or commerce." Memo at 14. The Defendant acknowledges that the Commonwealth courts have not yet determined whether 93A reaches municipalities. *Id.*

We agree with Defendant that the Court ought to rely, in part, on Judge Gorton's analysis of the relationship between 93A and municipalities that the Judge handed down in *City of Revere v. Boston/Logan Airport Associates, LLC*, 443 F.Supp.2d, 121, 128 (D.Mass. 2006). In that case, the court found that 93A could, and did in that case, apply to municipalities. Judge Gorton relied on *Park Drive Towing, Inc v. City of Revere*, 442 Mass. 80 (2004) in his analysis. In *Park Drive*, 442 Mass at 86, the SJC held there are four considerations in deciding whether a municipality is acting in a business context: (1) the nature of the transaction, (2) the character of the parties

involved and [their] activities, (3) whether the transaction is motivated by business reasons, and (4) whether the municipality's actions were motivated by legislative mandate.

First, there is no "legislative mandate" that requires a city in the Commonwealth to charge any fee to restaurants that want to operate outdoor dining, never mind to discriminately charge restaurants in one section of the city and not all the restaurants in the city. The only order issued by the Commonwealth allows cities and towns to *issue* outdoor dining licenses, not to charge extra money for those licenses, and even if they did, certainly not on a discriminatory basis. Therefore, the Defendant's order pertaining to fees is not motivated by legislative mandate.

Second, Plaintiffs assert that the nature of the transaction is primarily in the nature of a contract. Defendant's first consideration is that they will allow the Plaintiffs the right to operate their businesses outdoor in public ways in consideration of paying $7,500.00 fee, and the Defendants' primary consideration is that they pay to the City the $7,500.00 and then follow certain rules concerning the space they take on the public ways.

Third, the character of the parties is that of Executive officer and licensee, but the specific complaint in this case about the fee itself is commercial in nature. This is so because there is nothing in any legislation concerning the extension of outdoor dining that requires a municipality to collect a fee for a license. See *City of Revere v. Boston/Logan Airport Associates, LLC,* 416 F.Supp.2d 200, 210-211 (interaction between city and business is commercial in nature when there is no evidence that interaction if not pursuant to legislative mandate)

Fourth, it is obvious that the transaction involving the fee is motivated by business reasons: i.e., an extra tax on North End restauranteurs. The Plaintiffs already pay a fee for a

license to operate their restaurant. The Plaintiffs also pay a hefty tax on their businesses, and also collect taxes for the Commonwealth and City of Boston from their customers when they patronize their restaurants. The Defendant now perceived a way to increase the City's income by charging yet another tax or fee on the Plaintiffs by making them pay an extra $7,500.00 for a temporary extension of their restaurant license. Considering that there are dozens of restaurants involved in the North End, the total amount collected is in the hundreds of thousands of dollars.

The Defendant's main claim to avoid Massachusetts General Laws Chapter 93A liability in their Memo at 16 is to argue that they are "performing a primary governmental function of operating a regulatory scheme for licensing premises extension." That may be true, however, they are also operating a commercial business when they charge an additional discriminatory fee only to the North End restauranteurs without reasonable justification. There is not any legislation pertaining to the extension of outdoor dining that requires a municipality to charge an extra fee to restaurants. The Defendant went outside the authority they were given and saw an opportunity to extract more money from the Plaintiffs. This was a business decision.

Plaintiffs claim that they have overcome the four (4) considerations needed to subject a municipality to liability under Massachusetts General Laws Chapter 93A.

## CONCLUSION

For all the above reasons and in the interests of justice, the Defendant's Motion to Dismiss must be denied. If this Court is of a mind to delve into the Equal Protection issue because the Court does not find merit to Plaintiffs' due process argument, does not deny the Motion under a strict scrutiny analysis, and/or resorts to only a "rational basis" test and thus uses a "reasonably conceivable" review, then Plaintiffs respectfully request the Court hold an

26

evidentiary hearing because it is Plaintiffs' position that the claims of the Defendant, *inter alia*, concerning more problems in the North End related to outdoor dining, such as increased rodents, a need to power-wash areas, more trash and noise, have no basis in fact or law and that the City could not produce a scintilla of evidence to prove same. A cursory examination of the North End's actual conditions during outdoor dining would positively prove that virtually nothing has changed in the North End with outdoor dining except one thing: there are a few dozen fewer parking spaces on the streets.

Respectfully submitted,
The Plaintiffs,

DATED: August 31, 2022

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
Email: Richard@chamberslawoffice.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 31, 2022

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.