UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JORGE MENDOZA-ITURRALDE,
individually and as owner and President of
MONICA'S, INC.;

MONICA'S, INC.;

CARLA GOMES, individually, and as
owner and President of TERRAMIA, INC
and ANTICO FORNO, INC.;

TERRAMIA, INC.;

ANTICO FORNO, INC.;

JASON SILVESTRI, individually and as
principal owner and President of DOLCE
FUMA RESTAURANT GROUP CORP;

DOLCE FUMA RESTAURANT GROUP
CORP.;

PATRICK MENDOZA, doing business as
Monica's Trattoria on Prince,

     Plaintiffs,

     v.

MICHELLE WU, in her Capacity as
Mayor of the City of Boston

     Defendant.

Civil Action No.: 1:22-cv-10710

1

## FIRST AMENDED COMPLAINT

### I. PARTIES

1.  Jorge Mendoza-Iturralde (hereinafter, "J. Mendoza") is a white male of Italian descent, a resident of Massachusetts and owner and president of Monica's, Inc., a restaurant in Boston, Massachusetts, incorporated in the Commonwealth of Massachusetts.

2.  Monica's, Inc., is a corporation, duly organized within the Commonwealth of Massachusetts, doing business as *Vinoteca di Monica*, located at 143 Richmond Street, in the North End of Boston, Massachusetts.

3.  Carla Gomes (hereinafter, "Gomes") is a white female of Italian descent, a resident of Massachusetts and owner and president of Terramia, Inc., and Antico Forno, Inc., restaurants in Boston, Massachusetts, both incorporated within the Commonwealth of Massachusetts.

4.  Terramia, Inc., and Antico Forno, Inc., are corporations that are duly organized in the Commonwealth of Massachusetts and doing business as *Terramia Ristorante* and *Antico Forno* located at 98 Salem Street and 93 Salem Street, respectively, in the North End of Boston, Massachusetts.

5.  Jason Silvestri (hereinafter, "Silvestri") is a white male of Italian descent, a resident of Massachusetts and principal owner and president of Dolce Fuma Restaurant Group Corp., incorporated within the Commonwealth of Massachusetts, which operates as a restaurant in Boston, Massachusetts.

6.  Dolce Fuma Restaurant Group Corp., is a corporation that is duly organized in the Commonwealth of Massachusetts doing business as *Rabia's Dolce Fumo,* located at 73 Salem Street, in the North End of Boston, Massachusetts.

7.     Patrick Mendoza (hereinafter, "P. Mendoza") is a white male of Italian descent, a resident of Massachusetts and operates and is doing business as Monica's Trattoria at 67 Prince Street, in the North End of Boston, Massachusetts.

8.     Michelle Wu (hereinafter, "Mayor Wu" or the "Defendant") is the elected Mayor of the City of Boston, Massachusetts.

## II.  JURISDICTION

9.     The Court has jurisdiction in this matter pursuant to 42 USC § 1983 and 28 USC §§ 2201, 2202.

## III.  FACTS

10.     The Defendant, for the year 2022, issued an order pertaining to all restaurants within the City of Boston, dictating rules for restaurants that wanted to participate in the City's outdoor dining program. This special "outdoor dining order" was a continuation of the prior "outdoor dining program" that was sanctioned by the Commonwealth in response to the COVID-19 pandemic. In the two (2) previous years, outdoor dining licenses had been issued throughout Boston without any meaningful fees and the rules were evenly applied to all restaurants.

11.     Prior to 2022, numerous restaurants throughout the City of Boston participated in the "outdoor dining program" free of charge. The program chiefly allowed the participating restaurants the use of parking spaces and sidewalks in front of their restaurants the right to place tables outside for their patrons to use while dining. This space made up for restricted indoor dining and expanded the restaurants capacity when indoor dining was reinstated after the COVID-19 shutdown.

12.     Contemporaneously with such action in 2021, the City of Boston announced an initiative entitled "All Inclusive Boston Campaign", which had the purpose of attracting tourists from

throughout the world to visit the City of Boston and promote its neighborhoods and businesses in the wake of the detrimental effects of the COVID-19 pandemic. The initiative was funded with both Federal and City funds.

13.     The Defendant was elected Mayor of Boston in or about November of 2021 and subsequently entered into such office.

14.     On December 1, 2021, Defendant filed an Order with the Boston City Council that allows the City to designate up to 6 contracts of procurement solely from minority and/or women owned businesses.

15.     On January 11, 2022, this pilot program was initiated and after completion, Defendant filed an order with the Boston City Council authorizing a full scale "Sheltered Market Program" in Boston.

16.     Sheltered Market Programs are defined by M.G.L. Chapter 30(b) Section 18 and specifically exclude male and Caucasian owned businesses while specifically stating in part that the programs "shall to the extent constitutionally required be based on findings that such program is a remedy for the present effects of past discrimination".

17.     Prior to May 1, 2022, Mayor Wu, by and through her agents in Boston City Government, issued an Order (hereinafter, the "**Order**") that any restaurant in the "North End" of Boston that wanted to have outdoor dining for the summer of 2022 was required to apply for a license. The license would require a special Seven Thousand Five Hundred Dollars ("$7,500.00") fee, and every "parking space" used, in order to place tables on, would cost an additional Four Hundred Eighty Dollars ("$480.00") per month per parking space.

18.     The **Order** did not apply to any other area of Boston, and no other restaurants in Boston other than those located in the North End were required to pay the $7,500.00 license fee or the

$480.00 monthly parking fee. Upon information, which is believed to be true, no Boston restaurants, in the outdoor dining program, except those in the North End, paid for use of parking spaces.

19.    According to a map on the City's website, approximately three hundred and nineteen (319) licenses for outdoor dining were issued throughout the City. 46 of these licenses were for the North End of Boston, or roughly 15%. This same map shows that there are at least one hundred and fourteen (114) other restaurants nearby to the North End in the downtown area of the City with outdoor dining.

20.    Upon information and belief, the majority of those restaurants outside of the North End were not charged any fee for the outdoor dining license or for the use of parking spaces that they were granted to use for their patrons to dine outdoors. In other words, only sixty-four (64) North End restaurants were singled out to pay the aforementioned fees.

21.    The Defendant's outdoor dining **Order** also restricted the dates and times for which only the Plaintiffs' North End restaurants could operate outdoor dining under the program. In effect, outdoor dining in the North End could not begin until one (1) month after all other City restaurants were allowed to have outdoor dining, and outdoor dining in the North End would end three (3) months before outdoor dining ends in all other sections of the City.

22.    Contemporaneously with such action in 2021, the City of Boston announced an initiative entitled "All Inclusive Boston Campaign", which had the purpose of attracting tourists from throughout the world to visit the City of Boston and promote its neighborhoods and businesses in the wake of the detrimental effects from the COVID-19 pandemic. The initiative was funded with both Federal and City funds.

23.     On March 17, 2022, Defendant attended a St. Patrick's Day breakfast in South Boston, at which function she made a speech and specifically stated, "I'm getting used to dealing with problems that are expensive, disruptive and WHITE".

24.     It is commonly known that the traditional owner of a restaurant in the North End of Boston is a white male of Italian descent, and the North End is generally regarded at the last true ethnic Boston Italian neighborhood.

25.     On April 4, 2022, the Defendant announced a new Phase for the initiative "All Inclusive Boston" and appeared at a press conference for such purpose surrounded by persons and organization representatives with whom Defendant partnered with the program. The City of Boston awarded $1.495 million through a combination of Federal American Rescue Act ("ARPA") and City operating funds.

26.     At such conference, Defendant was surrounded by various partner groups to the initiative, and it was emphasized that the overwhelming majority of the marketing, promotion and contractors were women and/or minorities.

27.     At such conference, Colette Philips, CEO of Colette Philips Communications, Inc., who is regarded as the first person of color and woman owned public relations firm in the City of Boston, partnered with the Mayor's initiative. She specifically made clear that the "goal of the initiative was to change the narrative about the City of Boston but more importantly to reinvigorate the economy by driving visitors and residents alike to visit some of the traditionally under visited small businesses in neighborhoods like Roxbury, Chinatown, Dorchester, the South End, and more".

28.     The initiative has a website (allinclusiveboston.com) and a video highlight at www.bostonusa.com/allinclusivbos.

6

29.     The video displays various city features, displays many people in various settings, though none being white male and/or Italian, outside of a three (3) second take on Red Sox Players.

30.     The website has a button for local businesses. When activated, the choices are "Black Owned, Main Street Chinatown and City of Boston Black or Brown Owned and LatinoX" plus one additional button consisting of three hundred and twenty-three (323) pages of restaurants supporting the Greater Boston Convention and Visitors Bureau (hereinafter, "GBCVB").

31.     The GBCVB button has an additional button designated as "neighborhoods" (in context…"like our 23 neighborhoods") in its initial text. A review of what that button points to, including a video, reveals that the North End is completely omitted, and the video does not feature even one (1) white faced male or an Italian American.

32.     There is an additional button designated "Outdoor Dining" and North End restaurants are not displayed at this time due to the disparate treatment limiting only the outdoor season for North End participants.

33.     J. Mendoza owns Monica's Inc., which does business as *Vinoteca di Monica*, a restaurant located at 143 Richmond Street in the North End of Boston, Massachusetts. J. Mendoza is the president of the corporation, is the sole owner and makes all decisions relative to the restaurant.

34.     Monica's Inc. is a Massachusetts corporation which is afforded the same constitutional protection as a natural person, as corporations are generally regarded as a "fictional person" created by a government.

35.     Although the Plaintiffs J. Mendoza and Monica's, Inc., believed the special license fee is unconstitutional, in order to compete with other Boston restaurants, they paid the $7,500.00 special fee, as well as the fees for additional parking.

36.     J. Mendoza normally takes a salary from Monica's Inc., but only after all expenses and employee salaries are paid. If there is a surplus, he leaves it in the corporations' accounts. If there is a loss, he attributes his salary to the debt.

37.     With respect to the fees mentioned above, the fees were reflected in the corporations' losses and J. Mendoza attributed his salary and profit to cover the loss for the fees

38.     Gomes owns *Terramia Ristorante* and *Antico Forno* restaurants located at 98 Salem Street and 93 Salem Street, respectively, in the North End of Boston, Massachusetts. Both restaurants are duly organized Corporations incorporated under the names of Terramia, Inc. and Antico Forno, Inc. Gomes is the president of both corporations, is the sole owner of both, and makes all decisions relative to her ownership.

39.     Terramia, Inc. and Antico Forno, Inc., are both Massachusetts corporations which are afforded the same constitutional protection as a natural person as corporations are generally regarded as a "fictional person" created by a government.

40.     Although Gomes believes the special license fee is unconstitutional, in order to compete with other restaurants in the city of Boston, she authorized the $7,500.00 special fee be paid so she could have outdoor dining at the two (2) restaurants. Two (2) parking spaces are also used for outdoor dining purposes.

41.     Gomes normally takes a salary out of both corporations, but only after all expenses and salaries to employees are paid. If there is a loss, she attributes her salary to pay such debt.

42.     With respect to the fees mentioned above, they are reflected in the corporations' losses and Gomes attributed her salary and profit to cover the loss for the fees.

43.     Although parking spaces in the program are designated for forty (40) feet, the two (2) restaurants were only allowed thirty-two (32) feet for her allotted parking spaces.

44.     Silvestri owns *Rabia's Dolce Fumo,* located at 73 Salem Street, in the North End of Boston, Massachusetts, which is a d/b/a for Dolce Fuma Restaurant Group Corp. Silvestri is the President and makes corporate decisions relative to said ownership.

45.     Dolce Fuma Restaurant Group Corp., is a Massachusetts corporation which is afforded the same constitutional protection as a natural person as corporations are generally regarded as a "fictional person" created by a government.

46.     Although Silvestri believes the special license fee is unconstitutional, in order to compete with other restaurants in the city of Boston, he enrolled in the "payment plan" to pay the special fees to be able to have outdoor dining, taking up two (2) parking spaces for outdoor dining at this restaurant.

47.     Silvestri normally takes a salary from the corporation, but only after all expenses and salaries to employees are paid. If there is a loss, Silvestri attributes his salary toward such debt and does not take a salary.

48.     With respect to the fees mentioned above, they were reflected in the corporations' losses and Silvestri attributed his salary and profit to cover the loss for the fees.

49.     P. Mendoza owns and does business as *Monica's Trattoria*, located at 67 Prince Street, in the North End of Boston, Massachusetts. P. Mendoza is the sole owner and makes all decisions relative to his ownership.

50.     Although P. Mendoza believes the special license fee is unconstitutional in order to compete with other restaurants in the city of Boston, he enrolled in the "payment plan" to pay the special fees so he could have outdoor dining at his restaurant. He uses one (1) parking space for his outdoor dining.

51.     P. Mendoza normally takes a salary from the business, but only after all expenses and salaries to employees are paid. If there is a loss, P. Mendoza attributes his salary to such debt.

52.     With respect to the fees mentioned above, they were reflected in the corporations' losses and P. Mendoza attributed his salary and profit to cover the loss for the fees.

53.     Prior to the **Order** being handed down, Boston City officials, acting as agents for the Defendant, formed a committee to determine how outdoor dining would proceed in 2022. None of the Plaintiffs were part of the committee, however, they managed to keep apprised, through various means, of the discussions of the committee relative to the outdoor dining program. The Boston City officials failed to mention during the committee meetings anything about considering charging any fees for outdoor dining, nor did they discuss charging fees **only** to North End restaurants or limiting times and dates for North End restaurants as opposed to all other neighborhoods of the City.

54.     The announcement of the fees mentioned hereinabove were first stated in a Zoom meeting with the affected North End restaurants after the Committee had already made its determination. Upon information and belief, which is believed to be true, no written document was ever served upon the North End restaurant owners outlining the amount of the fees.

55.     Upon learning of said fees and the different starting and ending dates for North End restaurants as opposed to other sections of the City, Plaintiffs, among other North End restaurant owners, appeared at a meeting with Boston City officials at Boston City Hall to protest the fees, along with the starting and ending dates and voice their beliefs that same were discriminatory toward North End restaurant owners, the Italian ethnicity and white Italian men, and would severely diminish the Plaintiffs income and valuation of the affected businesses while providing an unfair advantage to unaffected businesses throughout the rest of the City.

56.     The Boston City officials mentioned above physically barred the Plaintiffs from entering and/or attending the meeting, although they allowed other restaurant owners to attend. Upon information, believed to be true, these latter restaurant owners were not opposed to the fees.

57.     The **Order** states an earlier starting date for all other restaurants and later ending date for all non-North End restaurants. Restaurants outside the North End are allowed a total of nine (9) months of outdoor dining as opposed to ONLY FIVE (5) FOR NORTH END RESTAURANTS, leading to unfair competition in all other parts of the City.

58.     The undersigned attorney, acting for his clients, sent a demand letter to Mayor Wu on or about April 5, 2022, requesting that she rescind the **Order**. The letter informed Mayor Wu that failure to do so would result in a civil action requesting a minimum of One Million and Five Hundred Thousand Dollars ("$1,500,000.00") in damages for each Plaintiff.

59.     Upon information and belief, believed to be true, the North End restaurants are a popular tourist attraction for people visiting Boston from around the United States and the world.

60.     A major attraction for tourists in the City of Boston is the Freedom Trail. The Freedom Trail begins in the Boston Common and ends in Charlestown at the U.S.S. Constitution. It passes down Hanover Street, the main street of the North End, with arguably the most restaurants, and takes visitors to the Paul Revere House and the Old North Church, two (2) North End stops on the Freedom Trail. Estimates from the National Park Service, which runs the Freedom Trail, claim that approximately four million (4,000,000) people visit it each year, and that the Freedom Trail "is a world-renowned, signature tourist experience". *See, thefreedomtrail.org.*

61.     Adjacent to the Boston Common where the Freedom Trail begins is the Public Garden. The Public Garden is considered an extension of the Boston Common. Newbury Street begins at the Public Garden. On each side of the length of Newbury Street are many high-end stores and

restaurants. Above these stores and restaurants are various-storied apartment buildings. Arguably, Newbury Street is comparable in size and construction to Hanover Street in the North End in that Newbury Street also has two (2) lanes for vehicle traffic (although one-way) and apartments over its restaurants and stores, and parking spaces on both sides of the street.

62.     Newbury Street arguably has as many, if not more, outdoor dining restaurants as does Hanover Street in the North End. Even restaurants on Newbury Street which have permanent outdoor dining on indented sidewalks have been allowed to extend their outdoor dining onto parking spaces.

63.     Upon information and belief, none of the Newbury Street restaurants with outdoor dining extending onto the street have been charged any fee for their license nor for the use of parking spaces to place their tables on for outdoor dining.

64.     Upon information and belief, no substitute parking spaces have been supplied for the loss of parking spaces residents and visitors to Newbury Street have suffered.

65.     If Plaintiffs refused to pay the fees mentioned above, they would not be allowed outdoor dining spaces. Without outdoor dining, Plaintiffs are not able to compete with other restaurants catering to the tourists mentioned above, nor would they have been able to compete for outdoor dining customers with any other restaurant in Boston that offers outdoor dining.

66.     During the time Plaintiffs were restricted from outdoor dining and all other restaurants were allowed to have outdoor dining, Plaintiffs were unable to compete for outdoor diners. Consequently, Plaintiffs have been damages and lost substantial income that could have been generated from enjoying the same outdoor dining rules as all other Boston restaurants.

## IV.  CLAIMS

## COUNT 1

### (Violation of Plaintiffs' Due Process Rights)

67.     Paragraphs 1-66 are referenced and incorporated into Count 1.

68.     The actions of the Defendant denied the Plaintiffs their rights to Due Process of Law as guaranteed them by the Constitution of the United States.

69.     Plaintiffs had a right under the First Amendment to the U.S. Constitution and Art. XIX of the Massachusetts Declaration of Rights to complain about the fees they were being charged and the restriction on dates for outdoor dining, for their protests to be properly heard, and for a redress of their grievances.

70.     Plaintiffs' substantive due process rights were denied when the Defendant failed to provide the discriminatory information, they were not included or informed throughout the defining process and intentionally barred from asserting their complaints and concerns at the Defendant's meeting that was held to specifically discuss the North End outdoor dining rules, fees and the times and dates for outdoor dining.

71.     Because of Defendant's action and inactions as aforementioned, Plaintiffs' procedural due process rights were denied and violated.

## COUNT II

### (Violation of Plaintiffs' Equal Protection and Treatment Rights)

72.     Paragraphs 1-71 are referenced and incorporated into Count II.

73.     Defendant's actions denied the Plaintiffs their rights to Equal Protection and Equal Treatment as guaranteed them by the Constitution of the United States and the Massachusetts Declaration of Rights.

13

74.     Pursuant to the Fourteenth Amendment to the United States Constitution, the Plaintiffs had a right to the equal protection and due process of the laws.

75.     Pursuant to Art. I of the Massachusetts Declaration of Rights the Plaintiffs had a right of "acquiring, possessing and protecting" their property.

76.     Pursuant to Art. XIX of the Massachusetts Declaration of Rights the plaintiffs had a right to "give instructions to their representatives" and to also, by way of several means, to seek "redress of the wrongs done them" and relate the wrongs "they suffer".

77.     The Plaintiffs have a right to the same outdoor dining rule to be applied fairly for their restaurants because the Defendant authorized outdoor dining for all restaurants in the City.

78.     The North End of Boston has been traditionally based upon and identified within and without as being of Italian ethnicity and is generally referred to as being the last defined ethnic community in the City of Boston.

79.     The common identity of a North End restauranteur is white, male and of Italian heritage.

80.     The Plaintiffs have a right to be treated the same as other restaurants in the City who were granted outdoor dining and not be singled out to pay fees that other restaurants were not forced to pay in order to have outdoor dining because of their sex or national origin/ethnicity as appears in this case.

81.     The Plaintiffs had a right to participate in the meetings setting the fees and dates for outdoor dining and discussing the fees and dates after the fees and dates were announced. The Plaintiffs rights were violated when they were barred from the meetings while other restauranteurs in the City were allowed to participate.

82.     The Plaintiffs were treated differently than were other restauranteurs who opted to have outdoor dining, in that they were charged fees for outdoor dining, and they were given shorter start times and end dates for their outdoor dining.

83.     The Plaintiffs were subject to discrimination by the Defendant because they are not minorities and are casualties in a specific and consistent discrimination scheme initiated and promoted by Defendant against Italian, Caucasian and male owned businesses and the actions of Defendant claimed herein were a part and furtherance of such scheme. The Defendant further expanded her scheme by specifically discriminating against Italian owned, North End restaurants by only charging them a $7,500.00 and parking fees.

## COUNT III

### (Violation of the Commerce Clause)

84.     Paragraphs 1-83 are referenced and incorporated into Count 3.

85.     The actions of the Defendant violated the Commerce Clause of the Constitution of the United States.

86.     The commerce of the United States is substantially affected by the tourist trade in the City of Boston.

87.     The Defendants' and other North End restaurants are part of the tourist trade in the City of Boston.

88.     Other restaurants in the City, such as those on Newbury Street. near the beginning of the Freedom Trail, are also part of the tourist trade.

89.     The Defendant's **Order** curtailing and limiting the North End's participation in outdoor dining by several months, less than other restaurants throughout the City, directly or indirectly affects the commerce of the United States either through the tourist trade or because the North

15

End restaurants will have less customers than other restaurants who have outdoor dining, thereby directly affecting the money the Plaintiffs will spend on food and goods order with their multi-national and domestic vendors.

## COUNT IV

### (Violation of M.G.L c. 93A, § 2)

90.    Paragraphs 1-89 are referenced and incorporated into Count 4.

91.    The actions of the Defendant set up "unfair methods of competition" and/or are "unfair or deceptive practices" in "commerce" in violation of M.G.L. c. 93A.

92.    The actions of the Defendant in charging North End restaurants, and no other restaurants in the City, fees for permission to operate outdoor dining, was a commercial and business decision.

93.    The Commonwealth's general order allowing municipalities the authority to grant licenses for outdoor dining in response to the COVID-19 pandemic did not require or mention charging any fees for such license.

94.    The license to have outdoor dining can be held to be a quasi-contract in that the North End restauranteurs were required to pay a fee, take certain safety measures, and follow certain rules, and for those considerations the City would issue them a license permitting them to have outdoor dining and to use public space to operate the outdoor dining.

95.    The Defendant is a licensor, and the Plaintiffs are licensees.

96.    The Defendant's action in charging only the North End restaurants a fee for a license to have outdoor dining was a business decision.  In effect, the Defendant decided it was good business to steer potential patrons away from the Plaintiffs and charge the North End restaurants

a fee to have outdoor dining, but bad business to charge the same fees to approximately 85% of the other restaurants in the City that received licenses to operate outdoor dining.

97.     The Defendant made a business decision to limit outdoor dining in the North End while extending the time for all other restaurants in other sections of the city, an unfair practice that limited the Plaintiffs' ability to compete with other restaurants in the City.

98.     The Defendant's actions set up unfair competition and was an unfair practice that affected the entire restaurant commerce of the city.

## V.  RELIEF

WHEREFORE, the Plaintiffs pray that this Honorable Court grant:

A.     A declaration that Plaintiffs' constitutional rights were violated and an order requiring just, proper and equitable relief.

B.     Compensatory damages in the amount of Five Hundred Thousand Dollars ("$500,000.00");

C.     Punitive damages in the amount of One Million Dollars ("$1,000,000.00");

D.     Reasonable attorneys' fees and costs of this action.

E.     Trial by jury.

F.     Such other and further relief that to the Court seems just, proper and equitable.

Respectfully submitted,
The Plaintiffs,
By their attorneys

DATED: October 21, 2022

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
Email: Richard@chamberslawoffice.com

*/s/ Joseph Spinale, Esq.*
Joseph Spinale, Esq.
BBO#: 548547
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 838-1411
Fax: (781) 581-8449
Email: Joe@chamberslawoffice.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

DATED: October 21, 2022

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.